Larry R. Laycock (4743) (Admitted *Pro Hac Vice*)
larry.laycock@dentons.com
Clinton E. Duke (9784) (Admitted *Pro Hac Vice*)
clinton.duke@dentons.com
Adam B. Beckstrom (14127) (Admitted *Pro Hac Vice*)
adam.beckstrom@dentons.com
DENTONS DURHAM JONES PINEGAR, P.C.
111 South Main Street, Suite 2400
Salt Lake City, UT  84111
Telephone: 801-415-3000

Lucas Buckley #6-3997
lbuckley@hkwyolaw.com
HATHAWAY & KUNZ, LLP
2515 Warren Avenue, Suite 500, P.O. Box 1208
Cheyenne, WY 82001
(307) 634-7723
ATTORNEYS FOR DEFENDANT

# UNITED STATES DISTRICT COURT
# FOR THE DISTRICT OF WYOMING

| | | |
|---|---|---|
| TIM TEICHERT on behalf of THE ESTATE OF HERMAN TEICHERT and THE ESTATE OF MINERVA TEICHERT, | ) ) ) ) | |
| Plaintiffs, | ) ) | |
| vs. | ) ) | |
| THE CHURCH OF JESUS CHRIST OF LATTER-DAY SAINTS, a Utah corporation sole; | ) ) ) ) ) | Case No. 2:21-cv-00145-ABJ |
| Defendant. | ) ) | |

## DEFENDANT'S MEMORANDUM IN SUPPORT OF MOTION FOR SUMMARY JUDGMENT

## **TABLE OF CONTENTS**

**Page**

INTRODUCTION .................................................................................................................. 1

STATEMENT OF UNDISPUTED MATERIAL FACTS ...................................................... 2

Background and General Allegations ................................................................................ 2

The Subject Paintings ........................................................................................................ 5

The Unsupported and Hearsay based Condition that was Allegedly Placed
Upon the Subject Paintings – the John A. Teichert Declaration ....................................... 9

Dedication of the New Cokeville Chapel in 1961 ........................................................... 11

Laurie Teichert Eastwood Inventory of Ownership of Original Teichert Artwork ......... 12

Informal Administration of Alleged Estate Assets by the Teichert Family
and the Teichert Family Collection ................................................................................. 14

Laches .............................................................................................................................. 18

LEGAL STANDARD ......................................................................................................... 19

ARGUMENT ...................................................................................................................... 19

    I.   Plaintiff lacks standing. ................................................................................... 19

    II.  Minerva Teichert unconditionally donated the Subject Paintings to the Church. .......... 21

    III.  Plaintiff did not retain any copyright interests in the Subject Paintings. ...................... 25

        a.   If published, Minerva did not retain any copyrights in the Subject Paintings............ 25

        b.   If unpublished, Minerva did not retain any copyrights in the Subject
           Paintings. .......................................................................................................... 27

        c.   Plaintiff is barred from claiming copyright ownership based upon the
           expiration of the applicable three-year statute of limitations ................................... 28

    IV.  Plaintiff's claims are barred as Plaintiff is bound by the acts of his predecessors......... 29

    V.   Plaintiff's claims are barred by the statute of limitations, laches, and waiver. .............. 31

        a.   Plaintiff's claims are barred by the statute of limitations. ....................................... 31

        b.   Plaintiff's claim is also barred by laches. ............................................................... 33

        c.   Plaintiff waived its claims. ................................................................................... 36

CONCLUSION..................................................................................................................... 36

# <u>TABLE OF AUTHORITIES</u>

**Page(s)**

**Cases**

*Bono v. Clark*, 128 Cal.Rptr.2d 31 (Cal. Ct. App. 2002)..........................................35

*Carnahan v. Lewis*, 273 P.3d 1065 (Wyo. 2012);............................................31

*Cooper v. NCS Pearson, Inc.*, 733 F.3d 1013 (10th Cir. 2013) ............................28

*Courtenay C. & Lucy Patten Davis Foundation v. Colorado State Univ. Research Fund*, 320 P 3d 1115 (Wyo. 2014)......................................21

*Delfelder v. Poston*, 293 P. 354 (Wyo. 1930) .....................................30, 31

*Ferguson v. Coronado Oil Co.*, 884 P.2d 971 (Wyo. 1994) ...............................25

*First Nat'l Bank at Cody v. Fay*, 341 P.2d 79 (Wyo. 1959) ..............................19

*Fowler v. Bailey*, 844 P.2d 141 (Okla. 1992) ................................................22

*Glickstein v. Sun Bank/Miami, N.A.*, 922 F.2d 666 (11th Cir. 1991)....................30

*Gottsberger v. Aldine Book Pub.*, 33 F. 381 (Mass.C.C.1887).........................26

*In re Randall's Estate*, 506 P.2d 432 (Wyo. 1973)..........................................20

*Kwan v. Schlein*, 634 F.3d 224 (2d Cir. 2011).................................................29

*LaCienega Music Co. v. ZZ Top*, 53 F.3d 950 (9th Cir. 1995)........................25, 26

*LeSEA, Inc. v. LeSEA Broad. Corp.*, No. 3:18CV914-PPS/MGG, 2023 WL <u>5428484</u> (N.D. Ind. Aug. 22, 2023) ................................................35

*Lieberman v. Mossbrook*, 208 P.3d 1296 (Wyo. 2009) ..................................31

*Lujan v. Defenders of Wildlife*, 504 U.S. 555 (1992) .....................................19

*Matter of Estate of Blaney*, 607 P.2d 354 (Wyo. 1980)...................................21

*Park County ex rel. Park County Welfare Dept. v. Blackburn*, 394 P.2d 793 (Wyo. 1964) ........20

*Pushman v. New York Graphic Socy.*, 287 N.Y. 302 (NY 1942) ........................27

*Ross Prods., Inc. v. New York Mdse. Co.*, 233 F.Supp. 260 (S.D.N.Y. 1964) .........26

*Sky Harbor Air Service, Inc. v. Cheyenne Regional Airport Bd.*, 368 P.3d 264 (Wyo. 2016) .....19

*State Farm Mut. Auto. Ins. Co. v. Petsch*, 261 F.2d 331 (10th Cir. 1958)....................36

*Van Ewing v. Hladky Construction, Inc.*, 48 P.3d 1086 (Wyo. 2002)...................passim

*White v. Kimmell*, 193 F.2d 744 (9th Cir. 1952)..............................................26

*Windsor Energy Group, LLC v. Noble Energy, Inc.*, 2014 WY 96, 330 P.3d 285 ...............33, 34

**Statutes**

17 U.S.C. § 101 ...........................................................................25

17 U.S.C. § 507 ...........................................................................28

17 U.S.C. § 301 ...........................................................................25

WYO. STAT. § 2-4-201 .................................................................30

WYO. STAT. § 1-3-105 .................................................................31

WYO. STAT. § 2-4-101 .................................................................20

WYO. STAT. § 2-7-403 .................................................................13

**Other Authorities**

30A C.J.S. Equity § 158.................................................................35

**Rules**

FED. R. CIV. P. 56 .................................................................................................... 1

Fed. R. Civ. P. 7 ...................................................................................................... 1

Fed. R. Civ. P. 7.1 ................................................................................................... 1

FED. R. EVID. 602 .................................................................................................. 24

Wyo. R. Civ. Pro. 7.1 .............................................................................................. 1

Pursuant to Rules 7 and 56 of the Federal Rules of Civil Procedure as well as Rule 7.1 of the Local Civil Rules for the United States District Court for the District of Wyoming, Defendant The Church of Jesus Christ of Latter-day Saints ("Defendant" or the "Church") submits its Memorandum in Support of Motion for Summary Judgment.

## <u>INTRODUCTION</u>

Minerva Teichert is an American artist known for paintings of the American west and various events in Church history. In 1931, at the height of the Great Depression, Minerva[1] was at risk of losing her home. But Minerva's desire to share her religious convictions through her art by donating her paintings to the Church and others was so strong that her longtime friend and agent Alice Merrill Horne ("Horne") had to implore Minerva to stop donating paintings: "To give to the Ward would be a splendid thing but you must not give everything." *Letters of Minerva Teichert Edited by Her Daughter, Laurie Teichert Eastwood*, attached hereto as **Exhibit A** at CHURCH 0032. Nevertheless, Minerva determined to follow her faith, and over her lifetime, donated dozens of paintings to the Church, her friends and family, and other institutions she loved. Three of those donated paintings are at issue in this case: *Relief Society Quilting*, *Cast Your Nets on the Other Side*, and *Handcart Pioneers* (the "Subject Paintings"). *See* ECF Dkt. No. 26 at ¶ 18. Minerva unconditionally donated these three paintings to the Church in the early 1930s. This is confirmed by contemporaneous records and an inventory prepared by Minerva's daughter, Laurie Teichert Eastwood, shortly before Minerva's death in 1976.

Now, nearly a century after Minerva donated the Subject Paintings to the Church, and nearly fifty years after Minerva's passing, Plaintiff Tim Teichert, Minerva's grandson, on behalf

---

[1] The Church refers to Minerva Teichert by her first name out of clarity, and not disrespect, given the numerous Teichert family members referenced in this brief.

of the Estate of Herman Teichert and the Estate of Minerva Teichert ("Plaintiff") seeks a declaration from this Court that the Subject Paintings belong to Plaintiff. But the evidence that Minerva donated these paintings to the Church is undisputed. Plaintiff admitted during discovery that he has no evidence that Minerva placed any conditions on her donation of the Subject Paintings to the Church. In fact, Plaintiff conceded that he does "not contest" transfers made by Minerva during her lifetime. *See* Deposition transcript for the 30(b)(6) Deposition of the Estates of Herman Teichert and Minerva Teichert by Timothy M. Teichert dated August 16, 2023, attached hereto as **Exhibit B** at p. 127:18-24.

In short, undisputed evidence shows that the Church is the owner of all rights and interests in the Subject Paintings. *See* Argument §§ II and III. The Church, therefore, respectfully requests an order of summary judgment dismissing this lawsuit.

But the Court need not even address that issue because Plaintiff lacks standing. *See* Argument § 1. The Court could also grant summary judgment because: (1) Plaintiff is bound by the acts of his predecessors and cannot contest the Church's ownership, Argument § IV, (2) Plaintiff's claims are barred by the statute of limitations, Argument § V(a), (3) Plaintiff's claims are barred by the doctrine of laches, Argument § V(b), and (4) Plaintiff has waived its claims, Argument § V(c).

## STATEMENT OF UNDISPUTED MATERIAL FACTS

### Background and General Allegations

1.      Minerva was a devout and faithful member of the Church who had a strong desire to pay tithes[2] to the Church. *See* Correspondence between local Wyoming Church leadership and

---

[2] Members of the Church, like Minerva, pay tithing to "show their gratitude to God for their blessings and their resolve to trust in the Lord rather than in material things." Tithing is used to "help further the work of the Lord in the earth." *See*  Tithing,  https://www.churchofjesuschrist.org/study/manual/gospel-topics/tithing?lang=eng#p2,  last  accessed January 3, 2024. A tithing donation is an unconditional gift. *See* Exhibit B at pp. 11:1-12:1.

the Office of the Presiding Bishopric of the Church from 1929 through 1939 regarding Minerva's donation of various paintings to the Church, true and accurate copies of which are attached hereto as **Exhibit C**. *See also id.* at CHURCH 0243-0244; Exhibit B at pp. 23:20-23, 24:3-26:12; *see also* Deposition Transcript for the Deposition of Timothy M. Teichert dated August 15, 2023, attached hereto as **Exhibit D** at pp. 11:1-12:1 (testifying that tithing is "irretrievable").

2.      Minerva sometimes donated art as tithes to the Church. *See generally* Exhibit. C.

3.      Minerva donated the Subject Paintings to the Church in the early 1930s as tithing donations. The paintings were displayed in the Church's meetinghouse in Cokeville. *See* Exhibit C at CHURCH 0243-0245; *see also* selected pages from Minerva's handwritten "Sales Book," true and accurate copies of which have been attached hereto as **Exhibit E**; Letters from Alice Merrill Horne to Minerva Teichert on April 22, 1932 and May 7, 1932, true and accurate copies of which are attached hereto as **Exhibit F**; *see also* Exhibit. D at pp. 19-21, 23-25; *see also* Exhibit A at CHURCH 0028 ("The Mormon meetinghouse was a small clapboard structure, which Minerva soon decorated with two lovely murals—one was a pioneer painting . . . and the other was a painting of Peter bringing forth a net, full to bursting with fish, after the Savior told him to case his net on the other side.").

4.      Minerva kept hand-written records of the paintings she had given away and sold. *See* Exhibit. E.

5.      In Minerva's hand-written records of who she gave her paintings to, Minerva wrote, *inter alia*:

> 1. "Handcart Pioneers" ---- Church LDS
> 2   "              "         Coke Church
> 3 Peter + Fishes          "       "

*See* Exhibit E at CHURCH 0014, as depicted below.

6.     Minerva did not put any copyright notices or "©" symbols on any of her original paintings, including the Subject Paintings, nor did she seek to register a copyright for any of her paintings. *See* Exhibit B at pp. 164, 167.

7.     Plaintiff representative Timothy ("Tim") Teichert testified, on behalf of the Estates of Minerva and Herman Teichert, that there is no written record of Minerva imposing any limitations or restrictions on any of her paintings when she sold or donated them. *Id.* at pp. 167-170.

8.      Despite the foregoing, Plaintiff asserts in the Amended Complaint, "***Upon information and belief***, the placement of the Cokeville Paintings [which includes the Subject Paintings] was conditioned upon the fact that if the Church or the local Church leadership ever decided it wanted to replace or remove the Cokeville Paintings, possession of the Cokeville Paintings would revert to their rightful owner, Minerva Teichert, or her heirs or other successors in interest." (ECF Dkt. No. 26 at ¶ 19) (emphasis added).

9.      Plaintiff has not produced any evidence to support this mere belief. Exhibit B at pp. 167-170.

<u>The Subject Paintings</u>

10.     In 1930, Minerva donated two paintings, without limitation, to the Church and received credit for $25.00 in tithing donations. Exhibit C at 0243-0245, 0289; Exhibit F at CHURCH 0194-0197; Tithing Record for the Cokeville Ward in the Montpelier Stake of the Church for 1929, a true and accurate copy of which is attached hereto as **Exhibit G** (listing $25.00 of "Other Tithes" contributed by Minerva Teichert in 1929).

11.     The first of the two paintings is often referred to as *Handcart Pioneers* or *Handcart Company* (hereinafter "*Handcart Pioneers 1*", which is not one of the paintings at issue in this litigation)



and the second is *Cast Your Nets on the Other Side*.



*See* Letter from Minerva Teichert to her Stake President (Montpelier Stake of the Church) at the time, President Rich on December 17, 1932, a true and accurate copy of which is attached hereto as **Exhibit H**; *see also* Exhibit A at CHURCH 0028.

    12.    At the time, Minerva and her husband, Herman Teichert, were poor and at risk of losing their ranch. Exhibit A at CHURCH 0028.

13.     Minerva continued to paint, and in 1931, she asked Horne to be her agent and help sell her paintings. *Id.*

14.     Horne helped Minerva sell her paintings so the Teicherts could make the required payments on the Ranch. *Id.*

15.     As part of these efforts, Horne wrote to Minerva on September 3, 1931, about getting the *Handcart Pioneers 1* painting back from the Church so she could sell it. "Find out if the Bishop will let you replace the Handcarts [from the Cokeville chapel]…." Horne also implored Minerva to stop donating paintings to the Church, "Nothing does so much good as to sell a picture. Nothing damages so much as to give a picture away, it is unprofessional. To give to the Ward would be a splendid thing but you must not give everything." *Id.* at CHURCH 0032.

16.     Horne wrote to Minerva on April 22, 1932, saying certain prospective buyers "like the Handcart." *See* Exhibit F at CHURCH 0194-0195. Horne asked Minerva, "Could you paint another for the Church if [the prospective buyers] would give $500. Drop me a line about it." *Id.*

17.     Horne referenced the fact that Minerva needed to sell paintings to save the ranch: "The prices are low but I believe will pay for the ranch deficits to date." *Id.*

18.     In a May 17, 1932 letter, Horne wrote to Minerva regarding the Handcart painting in Cokeville: "So this morning I went to see Bishop (Presiding) Sylvester Q. Cannon and had a heart to heart talk. I told him it was your gift for your tithes + offerings to your ward and that ***to help you save the place the Bishop said to sell it + paint them another picture***." *Id.* (emphasis added).

19.     After receiving permission from the Presiding Bishop of the Church, Horne and Minerva sold the *Handcart Pioneers 1* painting to the "general authorities of the church" in

summer of 1932, pursuant to the agreement that Minerva would replace *Handcart Pioneers 1* with another tithing handcart painting. *See* Exhibit H.

20.    Minerva wrote to her stake president, President Rich, on December 17, 1932, and stated, in relevant part:

> I am writing to tell you that the Handcart painting which I made for the Cokeville Ward for tithing in 1929 was sold to the general authorities of the church during this last summer. In its place is another painting, I believe equally good. The Church authorities also suggested that instead of paying cash on the sale of the painting for tithing that I make another painting to be used as our stake presidency or bishopric see fit. So I have made it. It is here. It is representative of my work...

*Id.*

21.    Minerva delivered the replacement painting (hereafter "*Handcart Pioneers 2*") to the Church at the Cokeville meetinghouse, stating it was "to be used as our stake presidency or bishopric see fit." *Id. Handcart Pioneers 2*, as depicted below, is one of the three Subject Paintings at issue in the present litigation.



22.    Minerva also donated the third Subject Painting, *Relief Society Quilting*, sometimes called *My Sisters of the Bible*, completed around 1932, to the Church.



*See* Exhibit D at pp. 23-25; *See also* Inventory prepared by Laurie Teichert Eastwood in 1976 titled, "PAINTINGS OF MINERVA KOHLHEPP TEICHERT (Florals not Included)," a true and accurate copy of which has been attached hereto as **Exhibit I** at CHURCH 0139.

23.     The Subject Paintings, including *Handcart Pioneers 2*, were all in the Church's possession and were displayed in the Cokeville meetinghouse that they were originally placed in until around 1961, when a new chapel in Cokeville was dedicated. Exhibit D at pp. 23-26, 89; *see also* Deposition Transcript for the Deposition of Dorothy Teichert, attached hereto as **Exhibit J** at p. 14:5–9.

<u>The Unsupported and Hearsay based Condition that was Allegedly Placed</u>
<u>Upon the Subject Paintings – the John A. Teichert Declaration</u>

24.     Plaintiff alleged in the Amended Complaint that, "Minerva Teichert's continued ownership of the subject paintings precluded ***anyone*** *from moving them to* ***any other location—be it a ward house, temple, or other Church property***." ECF Dkt. No. 26 at ¶ 20 (emphasis added).

25.     Plaintiff produced one document regarding this alleged condition, a declaration that John A. Teichert (Minerva's son) signed on May 26, 2016, in which he states that if the Church or local Church leadership ever decided it wanted to replace or remove the Cokeville Paintings from the Cokeville meetinghouse, possession of the Cokeville Paintings would revert to Minerva

Teichert or her heirs or other successors in interest. *See* Declaration of John A. Teichert, attached hereto as **Exhibit K** at ¶ 4. John Teichert, without any personal knowledge of the events, asserts details regarding what allegedly took place in 1955, decades after Minerva delivered the Subject Paintings to the Church. *Id. See also* Exhibit D at pp. 89:13-90:11.

26.    In 1955, Herman K. Teichert (Minerva's son and John's brother ) became the Bishop of the Cokeville Wyoming Ward, a local congregational unit of the Church. Exhibit K.

27.    In his declaration, John A. Teichert asserted that in 1955—decades after Minerva had given the Subject Paintings to the Church—that, "the Teichert family agreed to an arrangement with the Ward in which the ward would possess four (4) of Minerva's paintings (the 'Paintings') as long as the Paintings were displayed in the Cokeville ward," and that "My brother was the only person representing the Church in these discussions." *Id.* at p. 2.

28.    John did not identify in his declaration what individual, or group of individuals, constituted "the Teichert family" who allegedly entered into this "arrangement" with the Cokeville ward in 1955. *Id.*; *see also* Exhibit D at pg. 91.

29.    John A. Teichert passed away in or around March 2019, before this lawsuit was filed, and therefore cannot explain who "the *Teichert family*" referred to. Exhibit D at pp. 75, 85; *see also* Exhibit B at 175.

30.    Tim Teichert testified that John Teichert was not personally present when the "Teichert family" purportedly negotiated this arrangement with the Cokeville ward (John's brother Herman). Exhibit D at pp. 89-90.

31.    Tim Teichert also testified that he did not know who "the Teichert family" referred to. *Id.* at 90-91.

32.     Tim Teichert also testified that there is no other evidence of this alleged arrangement between the "Teichert family" and the Cokeville ward. *Id.* at 91-93.

33.     Tim Teichert testified that there is no evidence of Minerva herself imposing such a condition. Exhibit B at pp. 169-170 (Question: "[Y]ou'd agree with me that there is no written record of Minerva Teichert, herself, making any express limitations or restrictions with respect to any of those gifts of her paintings?" [Answer:] "I'm not aware of them"); Exhibit D at pp. 93-95, 97-98, 102-104.

34.     Tim Teichert also testified that the one person who could have potentially spoken to this alleged arrangement, Beulah Teichert, has passed away. Exhibit D at pp. 93-94.

35.     Between 1955 and the early 1960s, there were various instances in which the Subject Paintings were removed from the Church's meetinghouse in Cokeville and were displayed in other locations. Exhibit D at p. 113; *see also* Exhibit J at 14-15, 19, 42.

<u>Dedication of the New Cokeville Chapel in 1961</u>

36.     For much of her life, Minerva Teichert lived in Cokeville, Wyoming, and during that time, the Church's Cokeville Ward met at two different locations. ECF Dkt. No. 26 at ¶15.

37.     The first location was a small wooden (or "clapboard") meeting house (the "Cokeville Meetinghouse"), which is where the Subject Paintings were originally donated to the Church, delivered to the Church and displayed. *See* Exhibit A at CHURCH 0028.

38.     The second location is the Cokeville chapel located at 725 E. Main Street, which was dedicated upon its completion in 1961 (the "Cokeville Chapel"). ECF Dkt. No. 26 at ¶ 15; Exhibit A at CHURCH 0118-0119. The Cokeville Chapel is the building in which the Cokeville Ward currently meets. *Id.*

39.     At some point between 1955 and the early 1960s—after the Cokeville Chapel was dedicated—the Subject Paintings were moved from the Cokeville Meetinghouse to the Cokeville Chapel. *See, e.g.*, Exhibit D at p. 99.

<u>Laurie Teichert Eastwood Inventory of Ownership of Original Teichert Artwork</u>

40.     Near the end of Minerva's life, Laurie Teichert Eastwood (Minerva's daughter) conducted extensive research regarding the details and ownership of Minerva's artwork, which she compiled into an inventory titled, "Paintings of Minerva Kohlhepp Teichert (Florals not Included)," dated March 15, 1976 (hereafter the "1976 Inventory"). *See* Exhibit I.

41.     Plaintiff, Tim Teichert, testified that Laurie was a reliable source of information concerning Minerva, that Laurie conducted extensive research regarding Minerva's artwork, that nobody else in the family did as much research regarding Minerva's art or prepared an inventory, and that Tim had relied upon the 1976 Inventory in his efforts to identify Minerva's artwork. Exhibit D at 56-57, 153-154, 161, 217-218.

42.     The 1976 Inventory lists the Cokeville Ward as the owner of the Subject Paintings. Exhibit I at CHURCH 0137, CHURCH 0139.

43.     The 1976 Inventory does not indicate that Minerva or any of her descendants had any rights in the Subject Paintings. *See* Exhibit I.[3]

<u>The Estates of Minerva Teichert and Herman Adolph Teichert</u>

44.     Minerva died intestate on May 3, 1976, and was survived by her husband, Herman. *See* ECF Dkt. No. 26 at pg. 1, ¶1; *see also* Exhibit B at p. 75.

---

[3] In the "Present Owner" column of the 1976 Inventory, Laurie Teichert Eastwood had listed "MKT" as the owner of various paintings, including "Copy of Rembrandt's Man with the Beard," Frederick John Kohlhepp," "Herman A. Teichert," etc. *See, e.g.,* Exhibit I at CHURCH 0134-0136. The 1976 Inventory also listed other family members as the owners of various other paintings, including Laurie T. Eastwood, Hamilton Teichert, Robert Teichert, John Teichert, etc. *Id.* The 1976 Inventory did not reference "MKT" or any other Teichert family members as having any ownership rights in or to any of the Subject Paintings. *Id.* at CHURCH 0137, 0139.

45.     Plaintiff has affirmatively pleaded that all ownership and other rights in Minerva's property passed "by operation of law" to Herman Teichert. *Id.*; *see also* Exhibit B at pp. 81-83.

46.     Herman died intestate on November 25, 1982. (ECF Dkt. No. 26 at ¶ 2.)

47.     Tim Teichert was not appointed Administrator of either estate until over 42 years after Minerva's death and 35 years after Herman's death. *Id.* at ¶ 3.

48.     No estate tax return was ever filed or paid for either Estate. *See* Plaintiffs' Responses to Defendant's Second Set of Requests for Admission, which has been attached hereto as **Exhibit L**, Responses to Request For Admission Nos. 4 and 5. *Id.* at p. 4, Responses to Request For Admission Nos. 16 and 17.

49.     As of August 18, 2022, no inventories or reports outlining any assets allegedly owned by the either Estate had been prepared or submitted to the Court.[4] *See* Plaintiffs' Responses to Defendant's Second Set of Requests for Production, which has been attached hereto as **Exhibit M**, at Document Request Nos. 9 and 10 (stating on August 18, 2022 that, "Currently there are no inventories").

50.     There is no record that any heirs of either Estate ever requested or demanded that either Estate take any action to recover the Subject Paintings. *Id*. at p. 2, Response to Document Request No. 11.

---

[4] *See* Wyoming Stat. §§ 2-7-403 ("***Every personal representative shall make and return to the court within one hundred twenty (120) days after his [or her] appointment a true inventory upon his [or her] oath, of all the estate of the decedent, including the homestead, if any, which has come to his possession or knowledge.*** If the personal representative does not file such inventory within one hundred twenty (120) days, he [or she] shall show the court good cause for the delay and the court shall determine whether or not an extension of time shall be allowed. For failure to comply in good faith with the time limitations set forth, the personal representative shall be adjudged in contempt of court, and a fine imposed and other enforcement entered as the court in its discretion determines. Any fine assessed shall be paid into the corpus of the estate") (emphasis added).

<u>Informal Administration of Alleged Estate Assets by the Teichert Family</u>
<u>and the Teichert Family Collection</u>

51.     After Minerva died in 1976, her surviving husband, Herman Sr. was left "in charge of her estate," and all of Minerva's possessions and assets passed to him. *See* Exhibit B at 81; *see also* ECF Dkt. No. 26 at ¶ 1.

52.     After Herman Sr. died in 1982, the children of Minerva and Herman Sr. acted informally to manage Herman Sr.'s estate and to distribute estate assets. Exhibit B at 92, 94-96, 179-180; *see also* Deposition Transcript for the deposition of Stephen Teichert, attached hereto as **Exhibit N** at p. 28.

53.     By way of example, their children placed all of the art in either estate into a non-profit organization they founded called "The Teichert Family Collection." Exhibit B at 124-126. *See* Articles of Incorporation of The Teichert Family Collection, attached hereto as **Exhibit O**.

54.     The children also distributed art to various family members. Exhibit B at p. 74:16-25; Exhibit D at pp. 204-205.

55.     To date, the Estates of Minerva and Herman Sr. have not contested any of Minerva and Herman Sr.'s children's actions in forming The Teichert Family Collection and placing the art from the Estate(s) into The Teichert Family Collection, nor have the Estates contested the actions of The Teichert Family Collection. Exhibit B at 127. Article VII of the Articles of Incorporation for The Teichert Family Collection states that:

> In the event of the dissolution of the corporation, ***no member shall be entitled to any distribution or division of its remaining property or its proceeds***, and the balance of all money and other property received by the corporation . . . shall be used or distributed exclusively for the purpose within the intendment of Section 501(c) of the Internal Revenue as the same now exists or as it may be amended from time to time.

Exhibit O at Teichert 00006. (Emphasis added).

56.     One of the primary purposes of The Teichert Family Collection was to restore, conserve, frame, and exhibit "those paintings in possession of the family now." *See* Letter from Bob Teichert, President of The Teichert Family Collection, to the Visual Resource Library, dated August 3, 1987, a true and accurate copy of which is attached hereto as **Exhibit P**.

57.     In fact, Bob Teichert, President of The Teichert Family Collection, affirmatively represented—with his accompanying signature in multiple instances—that Minerva Teichert's estate ***became*** The Teichert Family Collection. *See* Various Acquisition Records documenting the Church's acquisition of various Minerva Teichert paintings, signed by Robert Teichert in 1988, attached hereto as **Exhibit Q** ("Upon Minerva Teichert's death, the painting passed into her estate, which became the Teichert Family Collection. . .").

58.     Bob Teichert, as President of The Teichert Family Collection, acknowledged, "Other paintings that [Minerva] sold or gave are not our property." *See* Exhibit P at CHURCH 0183.

59.     In a letter from John A. Teichert to "family" dated December 9, 1997, John wrote:

> I know that being at the end of the line my children got short changed. Mother was beyond her productive years. I guess I should have been more greedy in getting paintings, either by hook or crook. Patty has a charcoal sketch mother did of her on ply board. Ann has a small portrait of Dorothy holding her as a child. This mother did in her 70s. The other 7 have nothing other than prints we purchase[d] for them. I dare say that there isn't seven of her other grand Children that don't have something. I have the Lamb and the Lion, which all my children would like. I suppose that some day I will be asked to lay that on the alter. The only reason I have that, is because Dorothy rebelled when mother was going to set it for $100. to a Relief Society Sister, because she had a kind L.D.S. face. . . . ***Herman and I both wished mother were here to tell us what her wishes would be. I would abide by her wishes.***

Letter from John A. Teichert to "family," dated December 9, 1997, attached hereto as **Exhibit R**. (Emphasis added).

60.     On September 22, 1997, Bob Teichert wrote a letter to all of his siblings stating, "I addressed this letter to my three brothers and my sister because you and I constitute the five legal heirs of Minerva Teichert." Letter from Robert "Bob" Teichert to Herman, Hamilton, Laurie, and John dated September 22, 1997, attached hereto as **Exhibit S**.

61.     Bob stated, "I think that in our case, the only thing that we own, ***and that is in doubt***, is the copyrights to paintings that mother sold or gave to others without transferring copyrights to the recipients." *Id.* (Emphasis added). Bob added, "Personally, I do not want any ill feelings between the Teichert family and the Church or the B.Y.U." *Id.* at Teichert 00096.

62.     On October 31, 1997, Laurie wrote a letter to Hamilton regarding certain matters pertaining to The Teichert Family Collection, stating:

> Personally I do not believe we have copyrights. Bob hired an attorney with Collection funds to see if we really do own copyrights, which BYU attorneys say we do not have. The big issue now is what do we do with the large portraits so that the IRS does not get them—they already control what we do with them. Bob, Herman, and I feel that we must donate them to the BYU Museum of Art.

Letter from Laurie Eastwood Teichert to Hamilton Teichert dated October 31, 1997, attached hereto as **Exhibit T**.

63.     Laurie also indicated in her October 31, 1997, letter, "A great goal of our mother's was for her paintings to be seen, and to be tools in teaching, ***not for financial aid for all her descendants*** even to the third and fourth generations." *Id.* at Teichert 00094 (Emphasis added.)

64.     On January 15, 1988, John Teichert wrote to Bob Teichert stating, "I have never challenged the use of Mother's paintings on book covers, printing in magazines or whatever – it seems to give honor to her work. I probably will never challenge an others use or try to capitalize on her paintings." Letter from John Teichert to Bob Teichert dated January 15, 1998, attached hereto as **Exhibit U**.

65.    In another letter from around this same time frame, Bob Teichert wrote to Herman, Hamilton, Laurie, and John, stating in relevant part:

> I believe the time has come for us, as the heirs of Minerva K. Teichert, to make some decisions concerning our relationship to her art and to the future of that art. We're all getting older, and we are not totally immune to more serious illness, or even to death. ***We should not pass on decisions that we should make to the next generation.***

Letter from Bob to Herman, Hamilton, Laurie, and John, attached hereto as **Exhibit V**. (Emphasis added).

66.    Bob further wrote, "The non profit corporation formed presumably to protect the paintings we own jointly is not fulfilling its purposes. . . We will always have the I.R.S. looking over our shoulders. We can only give them to charitable institutions." *Id.*

<u>Church Preservation Efforts - Removal of the Subject Paintings from the Cokeville Chapel</u>

67.    In 2014, the Church informed members of the Cokeville ward and members of the Teichert family that to preserve the Church's original artwork, it would relocate the Subject Paintings to other Church facilities. ECF Dkt. No. 26 at ¶¶ 26-27.

68.    In 2020, Defendant moved the Subject Paintings to Church headquarters in Salt Lake City to be cleaned, repaired, and displayed. *See* Letter from the Church History Department to "Teichert family representatives" from August 2020, a true and accurate copy of which is attached hereto as **Exhibit W**.

69.    The Church hung high-quality giclée prints[5] in place of the original paintings that were moved from the Cokeville Chapel to Church headquarters. *Id.*

---

[5] A giclée print is a fine art print produced by the process of giclée—a process by which high-quality fine art prints are produced using an ink-jet printer. *See* https://www.merriam-webster.com/dictionary/gicl%C3%A9e.

Laches

70.     All of Herman Sr. and Minerva's children—who would have had information and knowledge relevant to the present litigation—died before this lawsuit was filed. Exhibit B at pp. 133-134; *see also id.* at 174-176.

71.     Many other witnesses who Plaintiff has indicated may have had relevant information died within the same timeframe, including, for example, Beulah Teichert. Exhibit B at 174-176; Exhibit D at pp. 92-94.

72.     Dorothy Teichert testified that there could be written documents relating to the alleged arrangement surrounding the ownership of the Subject Paintings. Exhibit J at pp. 9-10.

73.     If any of these documents did exist, they have either been lost or destroyed, as Tim Teichert testified that he is unaware of any written documents in existence related to the alleged arrangement. Exhibit D at p. 96.

74.     Plaintiff admitted that the Subject Paintings "were removed on occasion for an exhibit" and were "displayed in other locations" over the years. Exhibit D at pp. 112:24-113:9.

75.     Dorothy Teichert testified that at least one of the Subject Paintings, including *Relief Society Quilting,* was removed and placed in Herman Teichert Jr.'s home during renovations of the Church and that the Subject Paintings had been "removed for the purpose of exhibition at what was then Rick's College or university." Exhibit K at p. 14, 19:9-22.

76.     Plaintiff was aware no later than 2014 that the Church asserted rights contrary to his presently expressed contentions. Exhibit D. at p. 29:14-25.

77.     On November 10, 2021, Plaintiff admitted that "there is currently no written evidence that the Minerva Teichert Paintings were conveyed to [the Church] as conditional gifts." *See* Plaintiff's Responses to Defendant's First Set of Requests for Admission, which has been attached hereto as **Exhibit X**, at Request for Admission No. 2.

78.    On August 18, 2022, Plaintiff admitted that "Plaintiff does not have any written evidence that the Minerva Teichert Paintings were conveyed to [the Church] as conditional gifts beyond written or oral out-of-court statements offered by third parties for the truth of the matter(s) asserted." *See* **Exhibit Y**, at Request for Admission No. 15.

## LEGAL STANDARD

Summary judgment is required when "there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." FED. R. CIV. P. 56(a). A fact is genuinely disputed "if a reasonable juror could resolve the disputed fact in favor of either side." *Victory Processing, LLC v. Michael*, 333 F. Supp. 3d 1263, 1266 (D. Wyo. 2018). "A dispute of fact is material if under the substantive law it is essential to the proper disposition of the claim." *Id.* As shown herein, no material facts are, or can be, genuinely disputed and the Church is entitled to judgment as a matter of law. Plaintiff bears the burden of establishing each claim, and has failed to carry that burden. *See, e.g., First Nat'l Bank at Cody v. Fay*, 341 P.2d 79 (Wyo. 1959) (discarding the "rash philosophy" that the recipient of an asset must assume the "burden of proving that he should not be legally or equitably called upon to repay it" and affirming that a plaintiff bears the burden of proving a right he asserts).

## ARGUMENT

### I.    Plaintiff lacks standing.

"[S]tanding is an essential and unchanging part of the case-or-controversy requirement of Article III." *Lujan v. Defenders of Wildlife*, 504 U.S. 555, 560 (1992). A plaintiff has standing if it can show "(1) a concrete and particularized injury, (2) caused by the conduct complained of, and (3) that the injury will be redressed by a favorable decision." *Sky Harbor Air Service, Inc. v. Cheyenne Regional Airport Bd.*, 368 P.3d 264, 271 (Wyo. 2016). Here, Plaintiff cannot show a concrete and particularized injury.

Minerva died intestate on May 3, 1976. Statement of Undisputed Material Facts ("SOF") at ¶ 44. Wyoming law provided that at the time of her death title to her personal property passed to her intestate heirs. Wyo. Stat. § 2-7-402.[6]  At that time, same as today, Wyoming law identified Minerva's intestate heirs as follows, "one-half (1/2) … to the surviving husband … and the residue thereof to the surviving children and descendants of the children." WYO. STAT. ANN. § 2-4-101(a)(i). And "[r]ights of inheritance **vest immediately on the death of intestate** and devolutionary rights must be determined in relation to that date." *In re Randall's Estate*, 506 P.2d 432, 433 n.1 (Wyo. 1973) (emphasis added). *See also Park County ex rel. Park County Welfare Dept. v. Blackburn*, 394 P.2d 793, 794 (Wyo. 1964).

Assuming Plaintiff could present any admissible evidence that Minerva retained an ownership interest or a reversionary right in the Subject Paintings, all her title and rights "passed" automatically to her husband and surviving children at the moment of her death. *See* SOF at ¶¶ 45, 52-54. Thus, the Estate of Minerva Teichert, as a matter of law, could have no title interest in the Subject Paintings and cannot have standing to sue the Church for the Subject Paintings. That estate holds no rights that could be injured. *Id.* at ¶ 45.

The same is true of the Estate of Herman Teichert. Herman died intestate on November 25, 1982. SOF at ¶ 46. Any interest Herman held in the Subject Paintings passed automatically to his children (or their descendants) at the time of his passing. *See* WYO. STAT. ANN. § 2-4-101(c)(i); *In re Randall's Estate*, 506 P.2d at 433 n.1. Thus, same as the Estate of Minerva Teichert, the Estate of Herman Teichert holds no interest in the Subject Paintings and cannot be injured.

---

[6] A personal representative's potential claim to possession under Wyo. Stat. § 2-7-402 is not a cart blanche grant of power to control the title of a decedent's assets against third parties against the will of heirs, but rather a potential claim against title-holding heirs, and in that case, the personal representative's claim is merely to possession and is limited by general principals of law (including statutes of limitation, laches, and the principle that a court-appointed personal representative is still bound by the prior acts of unofficial family representatives under the doctrine of *administration de son tort*) and expressly limited in the estate "for the purposes of" four enumerated powers not at issue here: (1) estate administration, (2) estate sale, (3) homestead, and (4) estate debts.

Plaintiff in this case is Tim Teichert *on behalf of* the Estate of Herman Teichert and the Estate of Minerva Teichert. As a matter of law, neither estate can possibly have any interest in the Subject Paintings because any interest passed first from Minerva to her husband and children, then from Herman to the children. Therefore, Plaintiff lacks standing and the complaint must be dismissed.

But even if Plaintiff retained an ownership or reversionary interest in the Subject Paintings, Plaintiff still lacks standing. Under Wyoming law, "a donor who has made a completed charitable contribution … ha[s] no standing to bring an action to enforce the terms of his or her gift … unless he or she had expressly reserved the right to do so." *Courtenay C. & Lucy Patten Davis Foundation v. Colorado State Univ. Research Fund*, 320 P.3d 1115, 1125 (Wyo. 2014) (citation omitted, emphasis added). As shown in Sections II and III below, Minerva unconditionally gifted the Subject Paintings to the Church. The record contains no evidence that Minerva expressly reserved any rights in the Subject Paintings. Under Wyoming law, Plaintiff "ha[s] no standing to bring an action." *Id.*

## II.   Minerva Teichert unconditionally donated the Subject Paintings to the Church.

"A person has the right to give away his or her property as he or she chooses." *Van Ewing v. Hladky Construction, Inc.*, 48 P.3d 1086, 1089 (Wyo. 2002) (citation omitted). Such a gift is irrevocable. *Id.* Neither "the donor, his heirs, or his personal representatives" can revoke "a completed gift inter vivos …." *Matter of Estate of Blaney*, 607 P.2d 354, 357 n. 4 (Wyo. 1980). Thus, if (1) the donor demonstrates a present intention to make an immediate gift, (2) the donor delivers the gift, and (3) the donee accepts the gift, then the donor has made a valid gift that cannot be undone. *Van Ewing*, 48 P.3d at 1089. The undisputed material facts show that Minerva gifted the Subject Paintings to the Church over 90 years ago.

In 1930, Minerva unconditionally gifted *Handcart Pioneers I* and *Cast Your Nets on the Other Side* to the Church as tithing. *See* SOF at ¶¶ 3-5, 7, 10-11. Minerva was deeply religious with a strong desire to give tithes to the Church. SOF at ¶¶ 1-2. Minerva asked her ecclesiastical leader about donating these two paintings to the Church as tithing. SOF at ¶ 10. Unsure whether he could accept the paintings as a tithing donation, her ecclesiastical leader reached out to the Presiding Bishopric.[7] "I have a very faithful member here that is an artist…. She wants to have her name on the tithing book. She has two paintings that she wants to put in our meeting house." SOF at ¶ 1; *see also* Exhibit C at CHURCH 0243. The Presiding Bishopric accepted the paintings as tithing donations: "This will authorize you to accept from the Sister mentioned in your letter … the two paintings that she wishes to give to the church for $25.00 tithing credit." *Id*. at CHURCH 0289. Minerva then delivered the two paintings to the Church as tithing. SOF at ¶ 10. This is a completed gift that, under Wyoming law, is irrevocable. *Van Ewing*, 48 P.3d at 1089. "Donations to one's church are viewed in law as no more than gifts." *Fowler v. Bailey*, 844 P.2d 141, 150 (Okla. 1992) (Opala, J., concurring).[8]

Handcart Pioneers I was subsequently replaced by *Handcart Pioneers II*, which was also an unconditional gift to the Church. SOF at ¶¶ 19-21. During the Great Depression, to save her ranch, Minerva sought to sell some of her paintings. But Minerva understood that she no longer owned *Handcart Pioneers I*. The Church agreed to allow Minerva to sell *Handcart Pioneers I* (the Church bought it) in exchange for a replacement painting. *Id.* Minerva painted *Handcart Pioneers*

---

[7] The Presiding Bishopric "manage such matters as humanitarian aid, welfare programs, tithing …, physical facilities …, among others" on behalf of the Church. *See* Presiding Bishopric, https://www.churchofjesuschrist.org/learn/presiding-bishopric?lang=eng, last accessed Jan. 12, 2024.

[8] Tim Teichert testified that he understands that tithing is irretrievable. Exhibit D at p. 11 ("[Question:] In fact, you understand that once those charitable contributions have been made, that they are, indeed, irretrievable; isn't that the case? [Answer:] Yes. [Question:] And you understand that you can't later go back and say, 'I'd like my charitable contribution back, or I'd like to control that charitable contribution'? [Answer:] Correct.").

*II*, and gave it to the Church to replace *Handcart Pioneers I*. *Id*. Minerva's handwritten records confirm that *Handcart Pioneers I* and *II* and *Cast Your Nets on the Other Side* are owned by the Church. SOF at ¶ 5.

Minerva also donated *Relief Society Quilting* to the Church. SOF at ¶ 22. This painting was delivered to the Church in or around 1932 and has remained in the Church's possession since that time. *Id*. In 1976, a few months before Minerva's death, Minerva's daughter Laurie completed a formal inventory of Minerva's paintings and concluded that the Church was the owner of this painting—same as with *Handcart Pioneers I* and *II* and *Cast Your Nets on the Other Side*. *Id*.[9]

These undisputed facts show that Minerva unconditionally donated the Subject Paintings to the Church in the 1930s. As a matter of law, the Church is the owner of these paintings; Minerva retained no rights in these paintings that passed to Plaintiff.

Plaintiff alleges that Minerva conditioned her gift "such that if the local Cokeville ward no longer wanted the subject paintings they were to be returned to Minerva Teichert or her heirs." ECF Dkt. No. 26 Amended Complaint at ¶ 36. But Plaintiff acknowledged that tithing is "irretrievable" and, consequently, not subject to any conditions. *See* SOF ¶ 1; *see also* Exhibit B at 11:1-12:1. Regardless, despite years of discovery, Plaintiff has presented no admissible evidence to support this contention.

Under Wyoming law, a party may make a conditional gift by "express[ing] his condition ***at the time that the gift was made***." *Van Ewing*, 48 P.3d at 1089 (emphasis added). Minerva's expressed intention was to make a tithing donation—an unconditional gift. Furthermore, Plaintiff admits that Plaintiff does not have any admissible evidence to show that Minerva placed any

---

[9] Plaintiff viewed Laurie's inventory as reliable and has no evidence to contradict her conclusions as to ownership. SOF at ¶ 41.

limitations or conditions upon any paintings she sold or gifted to others. SOF at ¶¶ 7, 33; *see also* Exhibit B at 98:12-24; 102:12-104:6 ("I'm not aware of any agreement.").

Plaintiff's sole basis for claiming that Minerva's tithing donations were conditional is a 2016 hearsay-based declaration from his father, John Teichert. In that declaration, John alleges that in 1955—decades after the Subject Paintings were donated to the Church—"the Teichert family agreed to an arrangement with the Ward in which the ward would possess four (4) of Minerva's paintings … as long as the Paintings were displayed in the Cokeville ward." SOF at ¶¶ 25-35. This declaration is irrelevant. An alleged agreement by "the Teichert family" decades after the donation was made cannot, under any circumstance, show Minerva's intent at the time of donation more than two decades earlier. *See Van Ewing*, 48 P.3d at 1089 (requiring conditions to be expressed "at the time the gift was made").

But even if Minerva could place conditions on an already-completed gift decades later, this declaration is inadmissible. John Teichert was not present when the so called "arrangement" was supposedly made. SOF at ¶¶ 30. Thus, he lacks personal knowledge of the events described in the declaration. *See* FED. R. EVID. 602 ("A witness may testify to a matter only if evidence is introduced sufficient to support a finding that the witness has personal knowledge of the matter."). John's only basis for his belief is inadmissible hearsay. *Id.* 801-02. John (and Plaintiff) also do not identify who represented the "Teichert family" at this supposed meeting, and neither John nor anyone else says Minerva made this "arrangement." "SOF" at ¶¶ 30-31. Nor does he identify any authorized agent of the Church who was also part of this meeting. (John's brother allegedly represented the Church); Exhibit B at 106:3-20 (acknowledging that Tim does not know if his uncle was authorized to represent the Church). John Teichert's declaration is, therefore, both inadmissible and irrelevant.

The undisputed evidence shows that Minerva donated the Subject Paintings to the Church in the early 1930s—with no conditions attached. The Church has owned the Subject Paintings for nearly a century. Plaintiff's claim for Declaratory Relief must result in a declaration that the Church is the owner of these paintings. Plaintiff's claim for conversion must be dismissed because the Church cannot convert what it already owns as a matter of law.[10]

### III.   Plaintiff did not retain any copyright interests in the Subject Paintings.

Prior to passage of the 1976 Copyright Act, 17 U.S.C. § 101, *et seq.*, state common law governed copyright protections for *unpublished* works[11], and the Copyright Act of 1909 governed federal copyright protections for *published* works. *See* Copyright Act of 1909 §§ 2 and 9, 35 Stat. 1075 (Repealed Jan. 1, 1978); *see also Milton H. Greene Archives, Inc. v. BPI Commc'ns, Inc.*, 378 F. Supp. 2d 1189, 1195 (C.D. Cal. 2005) (citing *LaCienega Music Co. v. ZZ Top*, 53 F.3d 950 (9th Cir. 1995)). Because the Subject Paintings were created prior to passage of the 1976 Act, state common law and the 1909 Act govern. *See* 17 U.S.C. 301(b)(2). Regardless of whether this Court finds that the Subject Paintings were published or unpublished, the result is the same: Minerva did not retain any copyright interests to these paintings.

### a.   If published, Minerva did not retain any copyrights in the Subject Paintings.

Section 9 of the 1909 Act states in relevant part that, "any person entitled thereto by this Act may secure copyright for his [or her] work **by publication thereof** with the notice of copyright required by this act." Copyright Act of 1909 § 9, 35 Stat. 1075 (Repealed Jan. 1, 1978). Any person who has published their work with a notice of copyright was also required to file a copyright

---

[10] An essential element of a conversion claim is that Plaintiff had "legal title to the converted property." *See Ferguson v. Coronado Oil Co.*, 884 P.2d 971, 975 (Wyo. 1994).

[11] *See, e.g.*, House Report No. 94-1476, Historical and Revision Notes (noting the act was created to eliminate the "dual system of 'common law copyright' for unpublished works and statutory copyright for published works").

application with the U.S. Copyright Office in order to secure enforceable federal copyright protection. *See Id.* at §§ 5, 10. So, in order for a party to secure enforceable copyright protection for a published work under the 1909 Act, the party would have been required to (1) affix a copyright notice to the published work and (2) register that work with the Copyright Office. "If the owner failed to satisfy the [1909] Act's requirements, the published work was injected irrevocably into the public domain." *See Milton*, 378 F. Supp. 2d at 1195 (citing *LaCienega Music Co.*, 53 F.3d 950 (9th Cir. 1995)).

The undisputed facts of record indicate that the Subject Paintings were "published" for purposes of the Copyright Act of 1909. Although the term "published" is not explicitly defined in the 1909 Act, courts have held that a general publication—which resulted in the owner's loss of state common law copyright protection—occurred when the owner relinquished his or her right to control dissemination of that work unless the copies were explicitly restricted to (1) to a definitely selected group *and* (2) for a limited purpose. *See, e.g.*, *White v. Kimmell*, 193 F.2d 744, 746–47 (9th Cir. 1952) ("[C]irculation must be restricted both as to persons and purposes, or it can not be called private or limited publication."). Thus, courts have treated an unrestricted transfer—such as the sale, gift, or donation—of an original work to third party as a general publication. *See, e.g.*, *Gottsberger v. Aldine Book Pub.*, 33 F. 381 (Mass.C.C.1887) (holding that a single sale of single copy of a work to another constituted publication of the work and that, because the sale had occurred before the plaintiff procured a statutory copyright, he lost all rights); *see also Ross Prods., Inc. v. New York Mdse. Co.*, 233 F.Supp. 260 (S.D.N.Y. 1964) (holding that a "a sale to the general public constituted a general publication").

Here, Minerva transferred each of the Subject Paintings to the Church without any limitation. SOF at ¶¶ 4-5, 7, 10, 22, 33, 40-43. By doing so, Minerva relinquished her right to

control dissemination of these works (1) to a definitely selected group and (2) for any limited purpose. As a result, the Subject Paintings were published under the 1909 Act, which resulted in Minerva forfeiting any common law copyrights to these paintings. In order to secure enforceable federal copyright protection for those works, Minerva would have had to both (1) affix a copyright notice to the Subject Paintings and (2) register those works with the Copyright Office. Plaintiff has admitted that she did neither. SOF at ¶ 6. Because Minerva did not meet the 1909 Act's requirements for obtaining federal copyright protection, these works were injected irrevocably into the public domain.

> **b.    If unpublished, Minerva did not retain any copyrights in the Subject Paintings.**

Under the common law pre-1976 Copyright Act, an artist who desired to retain copyright protections in an unpublished work was required to make some reservation of right when the work was transferred. *Pushman v. New York Graphic Socy.*, 287 N.Y. 302, 308 (NY 1942). This common law rule has even deeper roots in the Anglo legal tradition. As far back as the 19th century, in *Parton v. Prang*, Justice Clifford, sitting as Circuit Justice, cited English cases for the proposition that, "[i]t is well settled law that even copyright is an incident to the ownership of a manuscript, and that it passes at common law with the transfer of a work of art." 18 F.Cas. 1273, 1277-78. Otherwise, the copyrights are transferred with the work. *Id.*

Significantly, Wyoming and Utah have both adopted English common law as the rule of decision in these respective states, absent a statute to the contrary. This rule has never been abrogated in Wyoming or Utah, by statute or otherwise, leaving the common law principle reflected in *Pushman* as the applicable doctrine.[12]

---

[12] This common law rule—that if an artist sold or transferred a physical painting to another person, the copyright to that painting was also conveyed *unless* the artist made an express reservation of that right—was abrogated by statute in New York and a handful of other states. The fact that certain other states had to abrogate this common law rule by

Here, even if this Court were to find that the Subject Paintings were not published pursuant to the Copyright Act of 1909, Plaintiff admits that Minerva made no reservation of rights when she transferred the Subject Paintings to the Church. Instead, Minerva transferred the Subject Paintings as tithing, which is an *unconditional* gift. SOF at ¶¶ 1-3. The legal implication of these facts is inescapable: Mrs. Teichert parted with any common law copyright interests that she may have held in or to the Subject Paintings the moment she transferred the paintings, without limitation to the Church.

In summary, regardless of whether this Court finds that the Subject Paintings were published or unpublished, the result is the same: Minerva did not retain any copyright interests to these paintings. If the Subject Paintings were published, Minerva forfeited any common law copyrights in them, and she did not receive any federal copyright protection because she failed to satisfy the requirements of the 1909 Act. If the Subject Paintings were *not* published, then Minerva transferred these common law copyrights to the Church along with the physical paintings because Minerva did not place any conditions or limitations on these transfers.

### c.   Plaintiff is barred from claiming copyright ownership based upon the expiration of the applicable three-year statute of limitations

A claim arising out of a dispute with respect to ownership of copyrights must be brought within three years of learning of an ownership dispute. *See* 17 U.S.C. § 507(b); *Cooper v. NCS*

---

statute further demonstrates that the prevailing common law rule—absent statutory abrogation—was precisely the one articulated above: at common law, transferring ownership of a physical painting, without limitation, also transferred the common law copyright in the painting to the transferee.

Any attempt to argue that the *Pushman* doctrine did not apply to Minerva's donation of the Subject paintings in Wyoming merely because the common law rule was abrogated in other states, is false and otherwise a non sequitur. More fundamentally, if the New York statute that abrogated the *Pushman* doctrine were at all relevant to Wyoming law or Utah law, the fact remains that the New York statute was not enacted until 1966—decades after all of the Subject Paintings were donated to the Church. So, unless Plaintiff is willing to contend that the passage of out-of-state statutes retroactively vitiated the effect of previously operative common law principles on the transfer of paintings in Wyoming, there is no genuine basis for any suggestion that the ownership transfers at issue here failed to convey the relevant common law copyright rights to the Church. And, for the record, any such contention regarding the effect of a later-enacted out-of-state statute would be altogether frivolous as a matter of law.

*Pearson, Inc.*, 733 F.3d 1013, 1016–17 (10th Cir. 2013) (holding plaintiff's infringement claim was time-barred where she was aware of dispute regarding her rights to the copyrighted work more than three years before filing suit); *Kwan v. Schlein*, 634 F.3d 224, 229–30 (2d Cir. 2011) (same, and discussing similar holdings from 6th and 9th Circuits). At least as early as 1997, all of the heirs (the children of Minerva and Herman Teichert) were aware of disputed ownership of copyright interests in Minerva's artwork. SOF at 62. The undisputed facts of record demonstrate that the statute of limitations for a claim of copyright ownership expired as early as November of 2000.

## IV. Plaintiff's claims are barred as Plaintiff is bound by the acts of his predecessors.

Again, even assuming Plaintiff could show it holds some right in the Subject Paintings and assuming Plaintiff could show that it has standing, Plaintiff's claims still fail. Plaintiff was appointed as Administrator of the Estate of Herman Teichert and the Estate of Minerva Teichert in 2018, about 42 years after Minerva died and over 35 years after Herman died. SOF at ¶ 47. What happened in those intervening four decades? Minerva and Herman's children—the beneficiaries of both estates and presumed administrators[13]—"informally" managed the estate[14] by:

- Creating "The Teichert Family Collection," which they maintained constituted the Estate of Minerva Teichert, and gathering art into this entity; SOF at ¶¶ 53-57;

- Distributing art to various family members; SOF at ¶ 54;

- Holding meetings and disposing of assets; Exhibit B at 179:24-180:11; and

- Discussing potential rights held by them or their parents' estates, including acknowledging that paintings "sold or gave" away during Minerva's lifetime did

---

[13] *See* Wyo. Stat. § 2-4-201(a).
[14] *See* Exhibit B at 96:10-14.

not belong to them, SOF at ¶¶ 58-60, and expressing doubts over holding any copyrights, SOF at ¶¶ 61-62.

Minerva and Herman's children took these actions in order to "***not*** pass on decisions that we should make to the next generation," *i.e.*, Plaintiff. SOF at ¶ 65. Plaintiff is bound by the actions of Minerva and Herman's heirs.

Whether the children are described as executors *de jure*, executors *de facto*, or executors *de son tort*, the result is the same: dismissal of Plaintiff's claims. While never formally appointed as administrators of either Minerva or Herman's estates, Wyoming law made Minerva and Herman's children administrators. *See* Wyo. Stat. § 2-4-201(a). Thus, the children were executor *de jure* of these estates, that is, the rightful executor of these estates even absent court appointment. *See, e.g.*, 34 C.J.S. Executors and Administrators § 219 ("The acts of a person prior to appointment as personal representative may act to bind an estate."). Similarly, the children may be considered executors *de facto* because they are, as a matter of fact, executors. *See, e.g.*, *Glickstein v. Sun Bank/Miami, N.A.*, 922 F.2d 666 (11th Cir. 1991) (accepting plaintiff's representation that he was "the '*de facto* personal representative' of the estate" and "had the capacity to represent it"). Finally, the children are also executors *de son tort* by their deliberate actions as executors. *See Delfelder v. Poston*, 293 P. 354, 361 (Wyo. 1930) (noting that "[l]egal and proper acts done by an executor de son tort sometimes are held good against the true representative of the estate") (cleaned up).

Here, Minerva and Herman's children admittedly acted as administrators of their parents' estates. They gathered up assets, investigated other potential assets (like copyrights), obtained the advice of counsel as to whether they owned such assets, then took actions to donate, distribute, and protect assets. Notably absent from their efforts are any attempts to reclaim the three Subject Paintings from the Church, or even seek copyright registrations for those paintings. That is because

these prior administrators knew that the "[o]ther paintings that [Minerva] sold or gave **are not our property**." SOF at ¶ 58 (emphasis added).

Plaintiff cannot unwind predecessors' acts. Rather, Tim Teichert, as the present administrator of the estates, is bound by them. Where, for decades, the Estates of Minerva and Herman acknowledged that the Subject Paintings were not their property and took no action to divest the Church of its ownership of those paintings, Plaintiff is estopped from doing so now. *See Delfelder*, 293 P. at 361.

**V.   Plaintiff's claims are barred by the statute of limitations, laches, and waiver.**

Finally, even assuming *arguendo*, that Plaintiff could prove that (1) Minerva did not gift the Subject Paintings to the Church, (2) Minerva placed a condition on the gifts at the time of donation, (3) any interest in the Subject Paintings remains in the estates, and (4) his predecessor executors did not expressly acknowledge that the estates held no rights in the Subject Paintings, Plaintiff's claims still fail. All claims are barred by the statute of limitations, by the doctrine of laches, and by waiver.

**a.   Plaintiff's claims are barred by the statute of limitations.**

Wyoming is a discovery state. Thus, "the statute of limitations is triggered when the claimant knows or has reason to know of the existence of a cause of action." *Lieberman v. Mossbrook*, 208 P.3d 1296, 1304 (Wyo. 2009). An action for recovery of personal property (Plaintiff's conversion claim) must be brought within four years of when, "with the exercise of reasonable diligence, [the plaintiff] would have known the property was converted." *Id.* The statute of limitations for declaratory relief is also four years. *Carnahan v. Lewis*, 273 P.3d 1065, 1073 (Wyo. 2012); WYO. STAT. § 1-3-105(a)(iv)(C).

According to Plaintiff, the Subject Paintings were placed in the Church's original Cokeville meetinghouse on the condition that "if the Church or the local Church leadership ever decided it

wanted to replace or remove the Cokeville Paintings," possession would revert to Minerva. ECF Dkt. No. 26 at ¶ 19. This condition prevented "*anyone* from moving them to *any other location—be it a ward house, temple, or other Church Property*." *Id.* ¶ 20 (emphasis added). This supposed condition was breached multiple times between the placement of the paintings in the original Cokeville meetinghouse in the early 1930s and the present.

For instance, at the time Minerva gifted the Subject Paintings to the Church, the Cokeville meetinghouse was a "small clapboard structure." SOF at ¶¶ 3, 37. In 1961, a new chapel was dedicated and used as the Cokeville meetinghouse. SOF at ¶ 38. About that time, the Subject Paintings were removed from the "small clapboard structure" and placed in this new chapel. SOF at ¶ 39. Moving the Subject Paintings from the original Cokeville Meetinghouse to another location—a distinct Church property—would have violated the condition that was allegedly placed on Minerva's gift, which prevented "anyone" from moving the paintings to "any other location." This type of violation also occurred various times *during Minerva's lifetime*. SOF at ¶¶ 35, 74. Yet no action commenced.

Additionally, at least one of the Subject Paintings, including *Relief Society Quilting*, hung in the home of Minerva's son, Herman Junior, for a time. SOF at ¶ 75; Exhibit K at 14-15, 19. Plaintiff also admitted that the "paintings were removed on occasion for an exhibit" and were "displayed in other locations." SOF at ¶ 35; *see also* Exhibit B at 112:24-113:9. These actions also violated the alleged condition. Yet again, no action commenced.

Finally, in 2014, the Church wrote a letter to Plaintiff's father, John Teichert, asserting its ownership over the Song of Quetzalcoatl—one of the four paintings supposedly subject to Minerva's unexpressed condition. Exhibit B at 29:14-21. At this time, Plaintiff not only had direct knowledge that the Church was asserting rights contrary to his now-asserted claims, but Plaintiff

was also expressly instructed by his father to pursue this right. *See* Exhibit D at p. 29. Yet Plaintiff delayed again, waiting until 2021 to commence this suit. ECF Dkt. No. 2.

Both of Plaintiff's claims are governed by a four-year statute of limitations. The undisputed material facts show that the condition Minerva allegedly placed on the Subject Paintings would have been violated at least as early as 1961, when the paintings were moved from the clapboard structure, and likely earlier as the paintings were removed and placed in Herman Junior's home and in various "other locations." Because Minerva, Herman, and much of the Teichert family attended Church regularly in the clapboard structure prior to 1961 (and then in the Cokeville chapel from 1961 moving forward), Minerva and Herman knew that the Subject Paintings had been removed from the clapboard structure in 1961 and placed in another, distinct location at that time. The statute of limitations, therefore, ran in 1965 while Minerva still lived and could have enforced this supposed right. At the very latest, the statute of limitations ran in 2018, four years after the Church asserted rights contrary to Plaintiff's understanding of the condition that was allegedly placed on the Subject Paintings and removed the Song of Quetzalcoatl from the Cokeville Chapel and indicated that the Subject Paintings would also be removed and relocated. Plaintiff's claim is barred as a matter of law.

### b.    Plaintiff's claim is also barred by laches.

Laches is an equitable remedy that "bars a claim when a party has delayed in enforcing its rights to the disadvantage of another." *Windsor Energy Group, LLC v. Noble Energy, Inc.*, 2014 WY 96, ¶ 12, 330 P.3d 285, 288. This equitable remedy is available even "in actions at law, including breach of contract actions, governed by a statute of limitations." *Id.* at ¶ 22, 330 P.3d at 291. Laches bars a claim when there is (1) inexcusable delay and (2) injury, prejudice, or disadvantage to the defendant due to the delay. *Id.* at ¶ 12, 330 P.3d at 289. Both elements are present here.

First, Plaintiff inexcusably delayed bringing this action. Minerva, her husband, her children, or Plaintiff could have asserted a claim for declaratory relief anytime between 1930 and the present. They did not. Minerva could have brought suit in 1961, while she was still living, after the Subject Paintings were removed from the clapboard structure. She did not. She could have brought suit after her son, Herman Junior, moved at least one painting into his home. She did not. Minerva and her heirs could have brought suit after the many times the paintings were moved for an exhibit or moved to "other locations," none of them did. Minerva's children, while forming and operating The Teichert Family Collection and discussing the existence of copyrights, could have brought suit. They did not. Minerva's children, while discussing and making decisions "concerning our relationship to her art and to the future of that art" and indicating that, "We should not pass on decisions that we should make to the next generation," could have brought suit. They did not. After the Church permanently removed the *Song of Quetzalcoatl* painting from the Cokeville chapel and indicated that it would remove and relocate the Subject Paintings back in 2014, Plaintiff or his father could have brought suit. They did not. Instead, Plaintiff waited until 2021—decades after the first supposed breach and years after Minerva, Herman, and all of their children had passed away—to bring suit. SOF at ¶ 70. There is no justification for this delay.

Second, the Church is prejudiced by the delay. Minerva died in 1976. Herman died in 1982. The last of their children, Plaintiff's father, died in 2019. *Id*. No living witnesses can speak to Minerva's intent *when she donated the paintings* to the Church in the 1930s (outside of the testimony found in the written records attached to this Memorandum). No living witness has personal knowledge of the alleged 1955 agreement described in John Teichert's hearsay-based declaration. SOF at ¶ 71.

Additionally, Dorthy Teichert (mother of Tim Teichert) testified that there could have been written documents relating to the alleged 1955 arrangement pertaining to the Subject Paintings. SOF at ¶ 72. However, if any such documents did exist, they have either been lost or destroyed, as Tim Teichert testified that he is unaware of any written documents in existence related to the alleged 1955 arrangement. SOF at ¶ 73.

This loss of witnesses and evidence is precisely the sort of prejudice that supports a successful laches defense. *See, e.g.*, 30A C.J.S. Equity § 158 Loss or obscuration of evidence as grounds for application of laches ("Classic elements of undue prejudice … include the unavailability of witnesses … and the loss of pertinent records."); *Bono v. Clark*, 128 Cal.Rptr.2d 31, 38 (Cal. Ct. App. 2002) ("Death of important witnesses may constitute prejudice.") (citation omitted). Plaintiff's supposed condition was allegedly violated, multiple times, during Minerva's lifetime. Waiting until 40 years after her death to sue is inexcusable. Both elements of laches are shown. Plaintiff's claims are barred for this additional reason.[15]

Other jurisdictions faced with lesser delays have held that laches applies. In *LeSEA, Inc. v. LeSEA Broad. Corp.*, No. 3:18CV914-PPS/MGG, 2023 WL 5428484, at *9 (N.D. Ind. Aug. 22, 2023), Dr. Lester Sumrall died in 1996, leaving behind more than 250 works unregistered with the Copyright Office, many of which were authored in the 1960s, 1970s, and 1980s. At the time of Dr. Sumrall's death, those works were held by his employer. Nine years later, one of his children, Frank, "began to take action to determine his rights of inheritance." But Frank waited another 12 years to probate his father's estate and assert those rights. The Northern District of Indiana held that laches barred Frank's claims. According to that court, the twelve-year delay between

---

[15] Plaintiff testified that each of the following witnesses, who could have testified to matters relevant to the present dispute, have passed away since Minerva Teichert's estate came into existence: Herman Teichert Sr., John Teichert, Robert Teichert Jr., Hamilton Teichert, Laurie Teichert Eastwood, among others. *See* Exhibit B at pp. 174-176.

(supposedly) first learning of his potential inheritance rights and commencing an action was "a classic case of … sleeping on his rights." Because witness's memories and documents were lost, the court noted that the defendant was prejudiced because production of relevant evidence "appears to be a near impossibility." So, laches barred Frank's claims.

The same reasoning applies here. Plaintiff delayed decades after Minerva's death before commencing this suit regarding works that were created in the 1930s. This inexcusable delay has resulted in substantial prejudice to the Church. It cannot question witnesses or uncover relevant evidence due to the passage of decades of time. Laches, therefore, also bars Plaintiff's claims.

### c.   Plaintiff waived its claims.

A party waives a right when (1) it has a right, (2) knows about that right, and (3) demonstrates an intention to relinquish the right. *State Farm Mut. Auto. Ins. Co. v. Petsch*, 261 F.2d 331, 334 (10th Cir. 1958). Here, Plaintiff asserts it owns or holds a reversionary interest in the Subject Paintings (a right). Based upon its own pleadings and admissions, Plaintiff knew of this right over 65 years ago. As a matter of law, if this right existed, Minerva expressly created this right in the 1930s. *See Van Ewing*, 48 P.3d at 1089. At the very latest, Plaintiff became aware of this right around 1955 when John Teichert alleged that an agreement was made. Finally, as described ad nauseum above, Plaintiff and his predecessors had numerous opportunities to assert this right but failed to do so. In fact, Plaintiff's predecessors acknowledged that they held no rights in the Subject Paintings and never asked for royalties or otherwise sought to enforce this supposed right. SOF at ¶¶ 61-64. This is waiver. For this final reason, Plaintiff's claims are barred as a matter of law.

### <u>CONCLUSION</u>

Plaintiff asserted two causes of action in this case: declaratory relief and conversion. To succeed on these claims, Plaintiff must establish that Minerva either did not donate the Subject

Paintings to the Church or donated the paintings conditionally. The undisputed material facts disprove both assertions. Minerva unconditionally donated the Subject Paintings to the Church in the 1930s, and so conveyed *all* rights in the paintings to the Church. As a result, the Court must enter summary judgment in the Church's favor, dismissing the conversion claim because the Church cannot convert its own property, and entering a declaration that the Church is the owner of the Subject Paintings. Additionally, Plaintiff's claims must also be dismissed as (1) Plaintiff lacks standing, (2) Plaintiff's claims are barred by the actions of his predecessors under the doctrines of executor *de jure*, executor *de facto*, and executor *de son tort*, (3) Plaintiff's claims are barred by the statute of limitations, (4) Plaintiff's claims are barred by laches, and (5) Plaintiff has waived Plaintiff's rights. In short, Plaintiff's claims fail as a matter of law.

DATED this 19th day of January, 2024.

/s/ Larry R. Laycock
Larry R. Laycock (4868) (Admitted Pro Hac Vice) larry.laycock@dentons.com
Clinton E. Duke (9784) (Admitted Pro Hac Vice) clinton.duke@dentons.com
Adam B. Beckstrom (14127) (Admitted Pro Hac Vice)
adam.beckstrom@dentons.com
DENTONS DURHAM JONES PINEGAR, P.C.
111 South Main Street, Suite 2400
Salt Lake City, UT 84111
Telephone: 801-415-3000

/s/ Lucas Buckley
Lucas Buckley (Wyo. Bar #6-3997)
HATHAWAY & KUNZ, LLP
P. O. Box 1208
Cheyenne, WY  82003-1208
Phone:  307-634-7723
Fax:  307-634-0985
lbuckley@hkwyolaw.com

ATTORNEYS FOR DEFENDANT

## <u>CERTIFICATE OF SERVICE</u>

This is to certify that on the 19th day of January 2024, a true and correct copy of the foregoing was served upon counsel as follows:

| | |
|---|---|
| Henry F. Bailey, Jr. | [ ✓] CM/ECF |
| Lance T. Harmon | [   ] U.S. Mail |
| Bailey Stock Harmon Cottam Lopez LLP | [   ] E-mail: |
| 6234 Yellowstone Road | hank@performance-law.com |
| Cheyenne, WY  82009 | lance@performance-law.com |

*/s/ Candice Hough*
HATHAWAY & KUNZ, LLP